3. If the Emily had followed her course, much more, if she had fallen off before the wind, which she might readily have done, the collision could not have occurred. It is, I think, reasonably certain, that the mistaken order of the mate to the man at the wheel, in connection with the derangement of the running rigging of the vessel, and the confusion on board among the hands, on account of the vessel's having misstayed a few minutes before, led to a change of course, and the consequent collision.

## Case No. 4,453.

### The EMILY.

[Olc. 132;[1] 6 N. Y. Leg. Obs. 340.]

District Court, S. D. New York. April, 1845.[2]

---

[1] [Reported by Edward R. Olcott, Esq.]

[2] [Affirmed in Case No. 4,452.]

N. F. Waring, for libellants.

F. B. Cutting and Moore & Havens, for claimants.

BETTS, District Judge. The libellants in this cause demand damages for losses occasioned by a collision occurring between the ship Virginia and the brig Emily, both vessels being on their way into the Hook from sea, and running against the wind. The case is a serious one in every aspect; it involves a loss of property of great magnitude, accompanied by a sudden and melancholy destruction of life, and the decision must inevitably tend to fasten blamable misconduct upon the party who fails to excuse himself from fault in this distressing catastrophe. Independent of the customary embarrassment attending collision cases, that of gathering the essential facts out of an entanglement of conflicting testimony, the additional one is presented here, that most of the proofs, and the reasoning touching the cause of the disaster, have relation to matters purely nautical and professional, whether proper seamanship was exhibited by the pilot of the brig on the occasion, in the judgment he adopted, and in the orders he gave as to the management of the vessel; or by the crew, in executing those orders. If, in my opinion, the rights of the parties depended upon the proper solution of these questions, I might feel it incumbent on me to invite the assistance of nautical men, in weighing and applying the proofs to these points, and to that end refer this branch of the case to competent mariners, to report their judgment upon it to the court.

I am constrained, however, to take a view of the subject which I am persuaded must prove less advantageous to the brig than to have had the professional skill of the pilot and good seamanship and conduct of the crew, in the particular manoeuvre excepted to, adopted as the turning point in the case. Both vessels were beating into the Hook, from sea, on the evening of the 18th of March, 1843. The wind was about N. N. W., and the Virginia was close hauled, or, in the language of the witnesses, jammed up to the wind, and running close in by the Sandy Hook shore. The Emily had made a tack from the Romer shoal towards the west, and the pilot judging she was but a few lengths from the shore, gave the proper directions for bringing her about on the other tack. In the attempt to do this, she mis-stayed, and orders were thereupon given to wear ship. Some slight accidents impeded bringing the sheets and sails, required to perfect this manoeuvre, into their places with promptitude. The witnesses on the brig differ widely in their

opinions as to her situation at the moment, and the point at which the Virginia was then discovered from her. The mate of the brig says, the Emily was in the act of wearing, and had fallen off about south or south by east, but had not gained headway enough to mind her helm. The pilot says, the Emily headed about S. W. in making the tack over from the Romer shoal, and that in wearing she never fell off more than to S. S. W., with her helm hard up, and was at no time heading east of south. She was on a direct tack to the shore then, and if she had luffed must have gone ashore. She might be going two or three knots at the time of collision. Davies, at the helm, says she was making perhaps four or five knots, and was in the act of wearing; he afterwards computed her movement at six knots, and says she steered easily. Martin thought she was going five or six knots, and, as he had judged from the lights on shore, ranged southerly towards the sea. James Smith says she was going about five knots, and names the sails that were drawing full at the time. It must, therefore, be taken as proved by the claimants, that the Emily had a sufficient steering headway on, and was bearing seaward from the Hook; the decided weight of evidence, moreover, is that she was to the leeward of the Virginia at the time.

A fact of great moment in this position of the two vessels is the want of a look-out on board the Emily. The Virginia was not discerned from her until an instant preceding the collision; and if a doubt might arise upon the evidence of those on board the Emily, whether the darkness of the night prevented their seeing an object ahead, the testimony from the Virginia puts the fact beyond question that a vessel might be seen a distance sufficiently great for the use of every precaution necessary to avoid it. This, I think, too, is the fair result of the evidence from those examined to this point, on board the Emily. No satisfactory conclusion can be formed from the estimate of minutes or yards given by witnesses at such a time, and it would be most dangerous to place the decision of important and critical questions on data so equivocal. It cannot be supposed witnesses can aver with any reasonable assurance that the time was two or ten minutes from the first effort to wear the ship to her collision, or that she was seen any definite distance in feet or yards, or for any certain number of minutes from the Virginia, having a supposed bearing S. of E., or that her distance from the shore was one or five hundred yards. Such computations must, in the nature of things, be essentially conjectural and at random, especially, when formed in the alarm of actual collision and sh'pwreck. Neither can we expect now to be assured by any reliable evidence how the Emily bore at the moment the Virginia was discovered almost in the act of collision with her, or what might have been the effect of the hurried and contradictory orders given her helmsman, under an impulse to ward off the impending shock or lessen its peril. It would seem, however, to be demonstrated by the evidence of pilot Ludlow, with the chart before him, and in presence of the pilot of the Emily, that the latter must have greatly misconceived his bearing, his distance from the shore and speed, when the Virginia was first seen by him, or in less than the time employed to pass the questions and answers between him and the mate, and give and countermand his orders to the helmsman, his vessel must have struck the shore. The place where the Emily anchored, and where the Virginia was found sunk, do not fix with precision the distance of the vessels from the shore at the collision, but they indicate it with more satisfactory approaches to certainty than the mere suppositions of witnesses formed under the confused and terrified state of mind and memory which must be supposed to attend the mischance on board the Emily, the darkness and roughness of the weather, and the consternation attending and following the striking of the two vessels together, and the foundering of the Virginia from the concussion.

From all the reliable facts in evidence, it seems to me proved, that the collision occurred a quarter or half a mile from the shore; and it results from the whole evidence that the Emily was pursuing a course bearing away from the Virginia, and then was seen suddenly coming down directly upon her whilst thrown up into the wind, and struck her in that position astern, and bearing S. W. or S. S. W.; it probably happened that after wearing from the shore a safe distance, by some accident or mismanagement she was put about on a tack tending to the land, and in that movement ran upon the Virginia, which was lying up in the wind between her and the shore. All the witnesses on board the Virginia assert that the Emily took the opposite direction. Her crew contradict it, but she, having no watch properly stationed on deck, is unable to meet the evidence from the Virginia with the evidence of witnesses, as advantageously stationed on the Emily to observe and describe the manner in which she, being to leeward, came in contact with the Virginia, to the windward, at the time pressing out of that course so far as to luff up and leave her sails shaking in the wind. The want of a proper watch on the Emily leaves the court to derive the facts best known to the look-out, from the witnesses on one side alone; and becomes, furthermore, a fault of grave magnitude in itself. It is justly regarded by maritime courts a delinquency in the vessel which fails to keep a competent look-out properly stationed, that renders her responsible for the consequences of collision, unless the clearest proof is made that the omission was in no way the cause of the disaster. The earlier and modern cases concur in this doctrine, and establish the mainte-

nance of an adequate look-out as a necessary measure of precaution, the neglect of which casts the responsibility for accidents on the delinquent vessel and her owners. The Chester, 3 Hagg. Adm. 316; The Diana, 1 W. Rob. Adm. 131. So, also, the rule of law is explicit, that a vessel running with the wind free, must take the risk of avoiding another sailing on a wind, when the two meet on opposite courses, if the free vessel has the opportunity and means, if properly used, of so doing. Indeed, the usage for the vessel on the wind to hold her course and for the one sailing free to give way in such case, has become a rule of law, which imposes the damage and losses occasioned by its non-observance, upon the vessel which disobeys the rule, unless it be clearly proved that her misconduct in no way contributed to the injury. Story, Bailm. § 611; 3 Kent, Comm. 184; 2 Dod. 83; The Thames, 5 C. Rob. Adm. 348; The Celt, 3 Hagg. Adm. 321; The Chester, Id. 316; The Diana, 1 W. Rob. Adm. 131; The Harriett, Id. 182. In the present case, the change of the Virginia's course was not toward the Emily, and with a view to pass to leeward of her, but in the opposite direction, and more out of her path, and the one she, to that moment, had been supposed pursuing.

I find in this case the preponderance of proof is against the defence set up by the Emily; it shows she was not in the act of wearing when the collision took place, but had come round so that her sails were filled, and she was bearing away before the wind; it shows that no sufficient and proper look-out was kept on her deck at the time, and it further shows that the Virginia was on the wind, keeping a prudent look-out, and making all proper efforts to avoid the collision. The intermission for the moment of that precautionary vigilance on board the Emily, might very naturally spring out of a confusion likely to arise from the failure of the vessel to come round on the wind, the dangerous proximity to the shore, the entanglement of some of the running rigging which impeded her manoeuvre, and the distraction these circumstances were calculated to produce in the attention of the mate, who at the moment appears to have been the only one acting as look-out forward. But they do not relieve the vessel from the obligation to maintain these precautions, or from the consequences of her omission to do so; nor from the obligation in her then position before the wind, of taking and preserving a course which should carry her clear of the Virginia.

This cause having been heard, and it appearing to the court that the collision in the pleadings mentioned, and the damages and costs incurred by the libellants in consequence thereof, occurred by the negligence and fault of the said brig Emily, it is considered that the libellants are entitled to recover the damages by them sustained thereby; wherefore it is ordered that it be referred to the clerk, to ascertain and report to the court the value of the said schooner Virginia, her tackle, apparel and furniture, at the time; her cargo then on board her, belonging to the libellants, and the amount of the loss in the premises sustained by the libellants by means of such collision, and that, on the coming in and confirmation of such report, a decree be entered therefor, in behalf of the libellants, and for their costs to be taxed.